1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   ANTONIO VASQUEZ,                )      No. C 05-4669 MMC (PR)
                                     )
12              Petitioner,          )      **ORDER DENYING PETITION FOR**
                                     )      **WRIT OF HABEAS CORPUS;**
13         v.                        )      **DENYING CERTIFICATE OF**
                                     )      **APPEALABILITY**
14   DAVID L. RUNNELS, Warden,       )
                                     )
15              Respondent.          )
     _____  )
16

17         Before the Court is the above-titled petition for a writ of habeas corpus, filed

18   November 15, 2005 by petitioner Antonio Vasquez pursuant to 28 U.S.C. § 2254,

19   challenging the validity of a judgment obtained against him in state court.  Respondent has

20   filed an answer to the petition and petitioner has filed a traverse.  In 2009, both parties, with

21   the Court's permission, filed supplemental briefing.

22                              **I.  PROCEDURAL HISTORY**

23         In 2001, an Alameda County jury found petitioner guilty of second degree murder of

24   his ex-wife, Rosie Vasquez ("Rosie"), and "premeditated attempted murder of her friend and

25   neighbor," Hugo Camacho ("Camacho").   (People  v. Vasquez, No. A098187 (Cal. Ct. App.

26   Nov. 14, 2003) (hereinafter, "Ex. 6") at 1.)[1]  The jury also found petitioner personally used a

27

28         _____

                 [1]All references to exhibits herein are to exhibits submitted by respondent.

firearm in the commission of the offenses and inflicted great bodily injury on Camacho.  (<u>Id.</u>

at 2.)  In 2002, the trial court sentenced petitioner to life in prison.  (<u>Id.</u> at 1.)

In a reasoned opinion, the California Court of Appeal affirmed, and the California

Supreme Court summarily denied petitioner's petition for review.  (<u>Id.</u> at 1; Ex. 8.)  Petitioner

also filed state habeas petitions in the California Court of Appeal and the California Supreme

Court (Exs. 9, 11), both of which were summarily denied (Exs.10, 12).

Thereafter, petitioner filed the instant petition for a writ of habeas corpus.

## II.  STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to

be as follows:

[Petitioner] and Rosie Vazquez were married in 1989 but broke up in 1995.  In 1999, [petitioner] made unwanted visits to Rosie's house on 52nd Avenue in Oakland. [Petitioner] spied on Rosie.  He harassed a male friend and co-worker of Rosie's, Ramon Hernandez.  Hernandez testified that in late summer 1999, [petitioner] told Hernandez he would kill him if he saw Hernandez at Rosie's house again. [Petitioner] also hung around Rosie's workplace.

Rosie became friends with her neighbor across the street, Hugo Camacho.  On several occasions, Camacho saw [petitioner] drive slowly by his house and stare at him like a "mad dog" or with an "ugly face."  Camacho once saw [petitioner] hiding in the bushes in the neighborhood and watching the street. [Petitioner] had a pair of binoculars and was wearing dark glasses and a hat.

On December 17, 1999, at approximately 9:00 p.m., Rosie and Camacho came home from a party in Camacho's car.  Camacho parked in front of his house and got out.  He saw a man running toward him.  The man was dressed in black and wore a mask.  When the man pulled his mask down, Camacho recognized him as [petitioner].  Camacho positively identified [petitioner] at trial and testified he was "one hundred percent" certain that [petitioner] was the black-clad man who accosted him.

[Petitioner] told Camacho, in Spanish, "I'm going to kill you, asshole." [Petitioner] raised a long gun, either a shotgun or rifle.  Camacho turned to flee. [Petitioner] shot him in the back.  Camacho fell and heard a scuffle and more shots.  Camacho stood and saw Rosie lying on the ground.  [petitioner] chased Camacho and shot him in the shoulder.  [Petitioner] tried to shoot Camacho again but his long gun either jammed or misfired.  [Petitioner] then pulled a handgun and pointed it at Camacho's face.  He fired several shots, hitting Camacho in his arm that he raised to protect himself.  Camacho ran away and managed to escape further harm.

Rosie had been killed by a single shot to the head.  Police found an M-1 rifle at the scene, with a shell casing jammed in the ejection port.  Four spent rifle shells were on the sidewalk.  [Petitioner] and Rosie's son identified the rifle as [petitioner's].  Police also found a revolver.  Five of its six rounds had been

fired.

Rosie and [petitioner's] daughter told police that [petitioner] had previously threatened to kill Rosie. Rosie had obtained a temporary restraining order (TRO) against [petitioner].

After being read his Miranda rights, defendant confessed to the murder and attempted murder, saying "I did it. Her and someone else who was there." He described parking on a side street near Rosie's house, waiting for Rosie and Camacho to come home, and loading his rifle and revolver. He said he saw Camacho put his hand between Rosie's legs. He "couldn't stand it" and fired both guns. He claimed he did not aim at Rosie, but shot her as she "cut across" his line of fire.

The jury convicted [petitioner] of the murder of Rosie and the premeditated attempted murder of Camacho, and found he personally used a firearm and inflicted great bodily injury on Camacho. The trial court sentenced [petitioner] to life.

(Ex. 6 at 2-3 (footnote omitted).)

# III. DISCUSSION

A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if

United States District Court
For the Northern District of California

1  it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases"

2  or if it "confronts a set of facts that are materially indistinguishable from a decision of [the

3  Supreme] Court and nevertheless arrives at a result different from [its] precedent." <u>Williams</u>,

4  529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court

5  may grant the writ if the state court identifies the correct governing legal principle from [the]

6  Court's decision but unreasonably applies that principle to the facts of the prisoner's case."

7  <u>Id.</u> at 413. "[A] federal habeas court may not issue the writ simply because that court

8  concludes in its independent judgment that the relevant state-court decision applied clearly

9  established federal law erroneously or incorrectly. Rather, that application must also be

10  unreasonable." <u>Id.</u> at 411.

11  Section 2254(d)(1) restricts the source of clearly established law to the Supreme

12  Court's jurisprudence. "Clearly established federal law, as determined by the Supreme Court

13  of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme]

14  Court's decisions as of the time of the relevant state-court decision." <u>Id.</u> at 412. "A federal

15  court may not overrule a state court for simply holding a view different from its own, when

16  the precedent from [the Supreme Court] is, at best, ambiguous." <u>Mitchell v. Esparza</u>, 540

17  U.S. 12, 17 (2003).

18  Here, the California Supreme Court summarily rejected on their merits the claims

19  petitioner raises by the instant petition. (Exs. 8, 12.) The Court of Appeal, in its opinion on

20  direct review (Ex. 6), addressed three of the claims petitioner raises by the instant petition.[2]

21  The Court of Appeal thus was the highest court to have done so in a reasoned decision, and,

22  as to those claims, it is the Court of Appeal's decision that this Court reviews herein. <u>See</u>

23  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-

24  92 (9th Cir. 2005). As to the claims for which there is no reasoned opinion available, the

25  United States Supreme Court has recently clarified that in applying the review provisions of

26  28 U.S.C. § 2254(d), a federal habeas court looks to the result reached by the highest state

27

28  [2] <u>See</u> <u>infra</u>, discussion of claims 5, 9, and 11.

1    court, and that the absence of reasoning does not prevent application of the standard of

2    review set forth in § 2254(d).  Harrington v. Richter, 131 S.Ct. 770, 784-85 (2011).

3    B.    Petitioner's Claims

4         Petitioner claims that: (1) the police coerced his confession, and, consequently, the

5    trial court's admission of it into evidence violated his Fifth and Fourteenth Amendment

6    rights; (2) the trial court's admission of his confession violated his rights because his waiver

7    of the right to remain silent and to have an attorney during police interrogation was not

8    "knowing and intelligent"; (3) the jury convicted him without constitutionally sufficient

9    evidence to support the verdict; (4) the trial court's admission of evidence of prior domestic

10   violence violated his due process right to a fair trial; (5) the trial court's admission of hearsay

11   evidence violated his Sixth Amendment right to confrontation;[3] (6) one of the jurors was not

12   qualified because she had problems understanding English, depriving him of his

13   constitutional right to a jury trial; (7) trial counsel was ineffective; (8) appellate counsel was

14   ineffective; (9) the trial court's rejection of his challenge to the prosecutor's peremptory

15   strike of an African-American prospective juror violated the Equal Protection Clause;

16   (10) the trial court's evaluation of his challenge to the peremptory challenge was inadequate;

17   (11) the clerk of court's failure to retain some of the jury questionnaires violated his right to

18   an effective appeal.

19        1.    Voluntariness of Confession

20        Petitioner contends his confession was a coerced statement and, as such, should not

21   have been admitted.

22             a.    Background

23   The Court of Appeal described the confession as follows:

24   After being read his Miranda rights, defendant confessed to the murder and
     attempted murder, saying "I did it.  Her and someone else who was there."  He
25   described parking on a side street near Rosie's house, waiting for Rosie and
     Camacho to come home, and loading his rifle and revolver.  He said he saw
26   Camacho put his hand between Rosie's legs.  He "couldn't stand it" and fired
     both guns.  He claimed he did not aim at Rosie, but shot her as she "cut across"
27   his line of fire.

28
     ───────────────
              [3] This claim comprises claims numbered 5 and 12 in the petition.

United States District Court
For the Northern District of California

(Ex. 6 at 3.)

Petitioner's claim that his confession was coerced was not presented on direct appeal, and, consequently, was not discussed in the California Court of Appeal's opinion.  Petitioner did present the claim, however, in his state habeas petitions filed in the California Court of Appeal (Ex. 9 at 16-18) and the California Supreme Court (Ex. 11 at 16-18).  The California Supreme Court's denial of the petition operates as a denial on the merits.  See Harrington, 131 S.Ct at 784-85.  The claim thus is exhausted.  See Castille v. Peoples, 489 U.S. 346, 350 (1989) (holding presentation of claim once to highest state court available suffices for purposes of exhaustion).

> b.    Analysis

Under the Fourteenth Amendment, involuntary confessions are inadmissible in state criminal cases.  Blackburn v. Alabama, 361 U.S. 199, 206-07 (1960).  Petitioner contends his confession was involuntary because Sergeant Enoch Olivas ("Olivas"), one of the two officers interrogating him, told him: "[Y]ou shot my wife's cousin, you ha[ve] no choice but to admit you did it."[4]  (Pet. at 6.)  In his traverse petitioner adds contentions that Olivas told him that if he did not admit the shooting, (1) petitioner's brother "was going to blamed for the shooting;" (2) his friend Jesus Rodriguez was going to blamed for the shooting; (3) Olivas would "make his children disappear;" and (4) Olivas's inmate friends would kill him in the jail.  (Trav. at 16.)

The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting the statements and the effect of that conduct on the suspect.  Miller v. Fenton, 474 U.S. 104, 116 (1985); Henry v. Kernan, 197 F.3d 1021, 1026 (9th Cir. 1999).  Absent police misconduct causally related to the confession, there is no basis for concluding a confession was involuntary in violation of the Fourteenth Amendment.  Colorado v. Connelly, 479 U.S. 157, 167 (1986); Norman v. Ducharme, 871 F.2d 1483, 1487 (9th Cir. 1989).

---

[4] The record reflects that Rosie Vasquez was one of Olivas's wife's "75-plus" cousins. (Ex. 1, Vol. 3 at 458-59.)

**United States District Court**
For the Northern District of California

1    In the instant case there is no evidence in the record to support petitioner's claim of

2    police misconduct and petitioner has failed to seek, let alone establish, a right to supplement

3    the record with additional evidence.[5]  Indeed, at the outset, the Court notes that although

4    petitioner filed a document titled "Supplemental Brief and Request for Evidentiary

5    Proceedings," other than such title, the only reference to an evidentiary hearing is in

6    petitioner's closing contention that "reversal" is required "or in the alternative an evidentiary

7    hearing to allow the reviewing [federal] court to make an accurate factual determination in

8    accord with Batson's step three (i.e., conducting comparative juror analysis, based on the

9    entire record)."  (Supp. Brief at 10) (emphasis omitted).)  As clearly set forth in petitioner's

10   brief, his request for an evidentiary hearing is confined to the issue of jury selection, and in

11   any event, as set forth below, petitioner's request does not meet the statutory requirements

12   for an evidentiary hearing.

13   Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court

14   may not hold an evidentiary hearing on a claim adjudicated by the state court on its merits.

15   Cullen v. Pinholster, 2011 WL 1225705 at *8 (April 4, 2011).  Moreover, under no

16   circumstances is such a hearing available to a habeas petitioner who has failed to develop a

17   factual basis in state court, unless such petitioner shows that: (1) the claim relies either on (a)

18   a new rule of constitutional law that the Supreme Court has made retroactive to cases on

19   collateral review, or (b) a factual predicate that could not have been previously discovered

20   through the exercise of due diligence, and (2) the facts underlying the claim would be

21   sufficient to establish by clear and convincing evidence that but for constitutional error, no

22   reasonable fact finder would have found the applicant guilty of the underlying offense.  28

23   U.S.C. § 2254(e)(2).  A prisoner "fails" to develop the factual basis of a claim, triggering §

24   2254(e)(2), if "there is lack of diligence, or some greater fault, attributable to the prisoner or

25   the prisoner's counsel."  Williams (Michael) v. Taylor, 529 U.S. 420, 432 (2000).

26   "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary

27   _____

28   [5] The only evidence in the record on the point is Olivas's testimony that he did not
threaten petitioner or make any promises to him.  (Ex. 1, Vol. 3 at 503.)

**United States District Court**
For the Northern District of California

1   hearing in state court in the manner prescribed by state law." <u>Id.</u> at 437.

2       Here, petitioner has not shown he endeavored to develop the factual basis for a

3   coerced confession claim in state court, nor has he shown any exception contained in

4   § 2254(e)(2) is applicable here.  Consequently, to the extent petitioner's "Supplemental Brief

5   and Request for Evidentiary Proceedings" is construed as a request for an evidentiary hearing

6   on the instant claim, such request will be denied.

7       In sum, because there is nothing in the record to support petitioner's claim of police

8   misconduct with regard to his confession, the instant claim is unavailing.

9       Accordingly, petitioner is not entitled to habeas relief on this claim.

10      2.   <u>Waiver of Miranda Rights</u>

11      Petitioner contends that in making the above-described confession, his waiver of his

12  <u>Miranda</u> rights, <u>see</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 473-74 (1966), was not knowing and

13  voluntary.

14      Where an accused is properly advised of his rights to remain silent, against

15  incrimination, and to counsel, such accused thereafter may waive those rights if his waiver is

16  voluntarily, knowingly, and intelligently made.  <u>Id.</u> at 471, 475.  A valid waiver of <u>Miranda</u>

17  rights depends upon the totality of the circumstances, including the "background, experience

18  and conduct" of the defendant.  <u>United States v. Bernard S.</u>, 795 F.2d 749, 751 (9th Cir.

19  1986).[6]

20      In the instant case petitioner was twice read his <u>Miranda</u> rights in Spanish, and

21  "having these rights in mind," agreed to speak with the officers.  (Ex. 1, Vol. 3 at 503, 506-

22  08.)  Such showing, in the absence of circumstances suggesting a contrary finding, is

23  sufficient to establish petitioner knew his rights and waived them knowingly and

24  intelligently.  <u>See</u> <u>Paulino v. Castro</u>, 371 F.3d 1083, 1086-87 (9th Cir. 2004) (holding

25

26      [6]A waiver may be either express or implied.  The Supreme Court recently has held
    that when a defendant is given a <u>Miranda</u> warning and understands it, such defendant's
27  "uncoerced statement establishes an implied waiver of the right to remain silent." <u>See</u>
    <u>Berghuis v. Thompkins</u>, 130 S.Ct. 2250, 2262 (2010).  As noted, the instant case involves an
28  express waiver.

1    statement by suspect that he understood his rights and wanted to talk to officer sufficient to

2    show waiver of right to counsel); United States v. Parra Cazares, 121 F.3d 1241, 1244 (9th

3    Cir. 1997) (holding recitation of rights in English and supervision of reading in Spanish,

4    accompanied by officer's orally confirming with suspect that he understood his rights,

5    sufficient to establish knowing and intelligent waiver).

6         Petitioner contends his waiver was not knowing and intelligent because he had little

7    previous contact with the criminal justice system, was illiterate in both English and Spanish,

8    and was subjected to coercion as discussed above.  As noted, there is no factual basis in the

9    state court record to support a finding of coercion, nor can petitioner rely on his illiteracy, as

10   he does not dispute that the warnings were read to him in Spanish.  Further, even if the Court

11   were to assume petitioner had little previous contact with the system, such factor would not

12   suffice to overcome the above-described evidence that petitioner's waiver was knowing and

13   intelligent.  See United States v. Amano, 229 F.3d 801, 805 (9th Cir. 2000) (holding where

14   suspect twice advised of his rights and waived them, lack of experience with justice system

15   insufficient to void waiver).

16        Accordingly, petitioner is not entitled to habeas relief on this claim.

17        3.    Sufficiency of the Evidence

18        Petitioner contends there was insufficient evidence to support his conviction of the

19   charged offenses.

20        The Due Process Clause "protects the accused against conviction except upon proof

21   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

22   charged."  In re Winship, 397 U.S. 358, 364 (1970).  Consequently, where a state prisoner

23   alleges that the evidence in support of his state conviction cannot be fairly characterized as

24   sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt, such

25   petitioner states a constitutional claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which,

26   if proven, entitles him to federal habeas relief, id. at 324.  For purposes of determining such

27   claim, the relevant inquiry is whether, "after viewing the evidence in the light most favorable

28   to the prosecution, any rational trier of fact could have found the essential elements of the

**United States District Court**
For the Northern District of California

1  crime beyond a reasonable doubt." <u>Id.</u> at 319.  Only if no rational trier of fact could have

2  found proof of guilt beyond a reasonable doubt, may the writ be granted.  <u>Id.</u> at 324.

3       Here, petitioner sets forth in his petition the "Supporting Facts" for this claim as

4  follows:  "Mr. Ramon Hernandez saw [Rosie] and Hugo together at the party, he indicated

5  that that was the last time he visited [Rosie].  It seems that Mr. Hernandez got mad with

6  [Rosie] and [H]ugo and for that reason he might have shot at them."  (Pet. at 6 (internal

7  citation to record omitted).)  In the traverse, petitioner expands on his argument that the

8  crime might have been committed by someone else, by attempting to cast doubt on Hugo

9  Camacho's identification of petitioner as the shooter and speculating that Rosie and Camacho

10  might have been shot by drug dealers, or possibly by the owner of a van Camacho hit while

11  parking his car, or by Hernandez.  (Trav. at 25-29.).[7]

12       Petitioner misapprehends the scope of habeas review for sufficiency of the evidence.

13  When considering a claim based on sufficiency of the evidence, the Court must "view[] the

14  evidence in the light most favorable to the prosecution," <u>Jackson</u>, 443 U.S. at 319, and, in so

15  doing, assumes the jury believed the evidence that supported guilt.  <u>See id.</u>  Here, that

16  evidence included not only Camacho's testimony that he recognized petitioner at the time

17  petitioner was shooting at him, but also petitioner's confession.  Such evidence was more

18  than sufficient evidence upon which a rational trier of fact could find the essential elements

19  of the crimes charged, including the enhancements, had been proved beyond a reasonable

20  doubt.

21       Accordingly, petitioner is not entitled to habeas relief on this claim.

22       4.    <u>Admissability of Domestic Violence Evidence:  Due Process</u>

23       Petitioner contends his due process rights were violated by the trial court's admission

24  of evidence that he had abused Rosie when they were living together and had threatened her

25  after they separated.  The evidence, admitted over petitioner's objection, concerned the

26  following two incidents.

27

28         [7] In his closing argument, petitioner's counsel attributed Rosie's murder to "a random shot fired by an unknown assailant."  ( Ex. 1, Vol. 7 at 1479.)

United States District Court
For the Northern District of California

1    In 1991, police officers responded to a domestic abuse call and took a statement from

2    Rosie. (Ex. 1 (Reporter's Transcript), Vol. 4 at 741.)  At trial, the written statement, signed

3    by Rosie, was read into the record and admitted as evidence along with foundational

4    testimony from the police officer who took it. (Id. at 741-49; Vol. 6 at 1358.)[8]  In 1999,

5    Rosie's attorney obtained a temporary restraining order ("TRO") against petitioner. (Id.,

6    Vol. 4 at 791, 793-94.) Rosie's declaration in support of and attached to the petition for a

7    TRO (id. at 794) was read into the record by the attorney who had prepared the petition and

8    the document was admitted into evidence.  (Id. at 795-97; id., Vol 3 at 340.)[9]

9    Petitioner's first trial had ended in a mistrial.  (Id., Vol. 1 at 5.)  In connection with

10   that earlier trial, the trial court had granted the prosecution's motion to admit the two

11   statements described above under a California statute that creates for domestic abuse cases an

12   exception to the general rule that propensity evidence is not admissible.  See Cal. Evid. Code

13   1101(a), 1109(a)(1).[10]  (Ex. 1, Vol. 9 (Jan. 22, 2001) at 30-31.)  At the retrial, the parties

14   discussed the admissibility of evidence of petitioner's prior bad acts, namely, Rosie's 1991

---

[8] In her 1991 statement, Rosie reported that petitioner became angry over the manner in which she was preparing dinner, punched her in the arm, stomach and shoulder, took the phone away from her during her call to 911, and forced her into the bedroom and held her there until the police arrived shortly thereafter.

[9] In her 1999 declaration, Rosie stated that following their marriage in 1989, petitioner became physically abusive, resulting in his arrest, a restraining order, and, after a failed reconciliation, her departure to Mexico in 1995.  Rosie further stated that upon her return in 1999, petitioner threatened to kill her if she didn't come back to him, and that Ramon Hernandez told her that petitioner had threatened to kill him if he found him again at Rosie's house, adding that he was a drug dealer and could have someone else do it for him.

[10] Section 1101(a) of the California Evidence Code provides: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

Section 1109(a)(1) of the evidence code provides: "(a)(1) Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

**United States District Court**
For the Northern District of California

1   statement to the police and her 1999 declaration in support of the TRO application.  (Ex. 1,

2   Vol. 1 at 6-11.)  At the retrial, the trial court adopted its earlier ruling.  (Id.)

3          The Supreme Court has never held the admission of evidence of prior crimes violates

4   the right to due process.  See Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991) (declining to

5   rule on constitutionality of propensity evidence); Alberni v. McDaniel, 458 F.3d 860, 863-67

6   (9th Cir. 2006) (holding, because Supreme Court has reserved question whether admission of

7   propensity evidence could violate due process, there is no clearly-established Supreme Court

8   authority on such issue and AEDPA thus bars habeas relief for such claim); Garceau v.

9   Woodford, 275 F.3d 769, 774 (9th Cir. 2002), rev'd on other grounds, 538 U.S. 202 (2003)

10  (noting "Supreme Court has never expressly held that it violates due process to admit other

11  crimes evidence for the purpose of showing conduct in conformity therewith").

12         As discussed above, a district court may not grant habeas relief unless the state court

13  decision was contrary to, or an unreasonable application of, clearly established federal law as

14  determined by the Supreme Court.  See 28 U.S.C. § 2254.  Consequently, in the absence of

15  Supreme Court precedent stating the admission of evidence of prior acts violates due process,

16  petitioner cannot satisfy this requirement.  See Alberni, 458 F.3d at 866-67.

17         Accordingly, petitioner is not entitled to habeas relief on this claim.

18         5.     Confrontation Clause Claims: Out-of-Court Statements

19                a.     Rosie's Statement and Declaration

20          Petitioner claims the admission of Rosie's 1991 statement to police and her 1999

21  declaration made in support of her application for a TRO also violated his rights under the

22  Confrontation Clause.  (Pet. at 6a-6b, 6i-6j.)

23         The Court of Appeal addressed only the admission of the 1999 TRO declaration (Ex.

24  6 at 11), and, applying a "trustworthiness" analysis predicated on Ohio v. Roberts, 448 U.S.

25  56, 66 (1980), concluded such ruling did not violate petitioner's Sixth Amendment rights

26

27

28

United States District Court

For the Northern District of California

under the Confrontation Clause (Ex. 6 at 11).[11]

In Crawford v. Washington, 541 U.S. 36 (2004), the United States Supreme Court rejected the Roberts approach and overruled that case as to "testimonial hearsay." See id. at 68-69. In particular, the Supreme Court held, out-of-court statements by witnesses that are "testimonial" in nature are barred under the Confrontation Clause unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness. Id. at 59. Because Crawford was decided on March 8, 2004, and petitioner's conviction did not become final until completion of direct review on April 21, 2004, respondent concedes Crawford is applicable. (Resp't P & A at 18.) Even if the Court of Appeal's rationale was incorrect, however, such circumstance is not dispositive, as this Court reviews the result reached by the state court, not its reasoning. See Harrington, 131 S.Ct. at 784-85.[12]

Given Crawford's definition of "testimonial" as a "solemn declaration or affirmation made for the purpose of establishing or proving some fact," Crawford, 541 U.S. at 51, Rosie's 1991 statement and 1999 declaration are arguably "testimonial." Even if so characterized, however, the evidence nonetheless was admissible under one of the two exceptions to the Crawford rule as recognized therein, specifically, "forfeiture by wrongdoing," an equitable doctrine that "extinguishes confrontation claims." Id. at 62; see Ponce v. Felker, 606 F.3d 596, 600 (9th Cir. 2010) (holding defendant's Confrontation Clause rights may be forfeited where defendant has wrongfully caused witness to be

---

[11] In his state habeas petition in the California Supreme Court, petitioner presented his Confrontation Clause claim with respect to both statements, and thus the claim is exhausted as to both. (See Ex. 11 at 33-38); Castille v. Peoples, 489 U.S. at 350 (holding presentation of claim once to highest state court available suffices for purposes of exhaustion).

[12] As noted, the trial court admitted into evidence both a 1991 statement and a 1999 declaration and the Court of Appeal's reasoned opinion addresses only the latter. There is some question as to whether, under Harrington, the district court reviews not only an unexplained decision but also an incorrectly reasoned decision under § 2254(d), or only the former, thus requiring a different standard of review for the above two out-of-court statements. See Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (holding where state court applies erroneous reasoning, review on habeas is de novo and "'without the deference AEDPA otherwise requires'") (quoting Panetti v. Quarterman, 127 S.Ct. 2842, 2858 (2007)). Here, however,, whether the review is deferential or de novo, petitioner's Confrontation Clause claim is, as set forth below, unavailing.

United States District Court
For the Northern District of California

1    unavailable to testify).  In particular, petitioner murdered the witness who gave the

2    statements at issue, thus causing her to be unavailable at trial.  Although in <u>Giles v.</u>

3    <u>California</u>, 128 S. Ct. 2678 (2008), the Supreme Court subsequently found the wrongdoer

4    also must have intended to prevent the victim from appearing as a witness, <u>id.</u> at 357-368,

5    and although there is nothing in the record that suggests petitioner committed the murder to

6    prevent Rosie's testimony, the Ninth Circuit has held <u>Giles</u> announced a new rule that does

7    not apply retroactively on habeas review.  <u>See</u> <u>Ponce</u>, 606 F.3d at 604, 606 (denying habeas

8    relief on claim petitioner's confrontation rights violated by admission of victim's pre-offense

9    testimonial statements; holding intent requirement not part of "clearly established federal

10   law" prior to <u>Giles</u>.  <u>Id.</u> at 606.  Petitioner's claim thus is barred by the doctrine of forfeiture

11   by wrongdoing.  In any event, as set forth below, even if the statement and declaration were

12   not properly admitted, petitioner has failed to show he was prejudiced thereby.

13       When a federal district court is reviewing a state court conviction under 28 U.S.C.

14   § 2254, relief may be granted only if the improperly admitted evidence "had substantial and

15   injurious effect or influence in determining the jury's verdict," i.e., a habeas petitioner must

16   show "actual prejudice."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637-38 (1993).  Here, the

17   surviving victim, who was familiar with petitioner from the neighborhood and had ample

18   time and opportunity to observe the shooter during the events at issue, identified petitioner as

19   the shooter.  Moreover, although motive is not an element of the offenses for which

20   petitioner was convicted, the testimony of Ramon Hernandez provided highly credible

21   evidence of petitioner's motive.[13]  Further, petitioner confessed.  Although the defense was

22   based on identity rather than state of mind, there was considerable evidence as to that

23   element as well, the shooter having made his intent patently clear, both verbally and in his

24

25

26

27       [13] In light of such testimony, to the extent the 1999 declaration made reference to
28   petitioner's having threatened to kill Ramon Hernandez, such evidence was before the jury
     through Hernandez himself.

1  determined efforts to carry out his purpose.[14]  In other words, there was overwhelming

2  evidence of petitioner's guilt.

3       Accordingly, to the extent this claim is based on Rosie's statement and declaration,

4  petitioner is not entitled to habeas relief.

5            b.    Children's Statements

6       Petitioner contends the admission, over his objection, of testimony describing

7  statements made by his and Rosie's children, Jesus and Nancy, violated his rights under the

8  Confrontation Clause.  (Pet. at 8-9.)  At trial, a police officer testified that in a statement she

9  took from Nancy shortly after the shooting, Nancy told her that petitioner had threatened to

10  kill her mother (Ex. 1, Vol. 4 at 898-900); another officer testified that when he showed Jesus

11  the murder weapon, Jesus said it was the one "papi" ("daddy") "has at the house" (id., Vol. 3

12  at 491).

13       As discussed above, Crawford applies to statements that are "testimonial" in nature.

14  See Crawford, 541 U.S. at 59, 68-69.  "Statements are nontestimonial when made in the

15  course of police interrogation under circumstances objectively indicating that the primary

16  purpose of the interrogation is to enable police assistance to meet an ongoing emergency."

17  Davis v. Washington, 547 U.S. 813, 822 (2006).  "[T]he existence and duration of an

18  emergency depend on the type and scope of danger posed to the victim, the police, and the

19  public."  Michigan v. Bryant, 131 S.Ct. 1143, 1162 (2011); see id. at 1150, 1164 (finding

20  ongoing emergency where police responded shortly after shooting and took statement from

21  mortally wounded victim as to identity of shooter and circumstances of shooting, and where

22  location of shooter and motive unknown).

23       Here, police officers arrived at the scene not knowing where the suspect might be (Ex.

24  1, Vol. 4 at 881), approached the scene with their guns drawn (id.), found Comacho badly

25  wounded on the porch and Rosie's body on the ground (id. at 882), and, after speaking to

26

27      [14] Petitioner did not testify.  To the extent he claimed in his confession that Rosie was

28  caught in his line of fire, such circumstance, even if accepted by the jury, is not a defense to
murder and the jury was so instructed.  (See Ex. 1, Vol. 7 at 1428-29.)

1   Comacho, alerted dispatch that the suspect was the deceased victim's husband and that it was

2   unknown whether he was on foot or in a vehicle (id. at 887).  The officer assigned thereafter

3   to speak to Nancy was attempting to obtain the name of the suspect and also to learn the

4   relationship between the suspect and her mother.  (Id. at 898.)  Although by that time,

5   weapons had been recovered at the scene, the police had no way of knowing whether the

6   suspect had other weapons nor could they be sure of his state of mind, and, indeed, still

7   needed to confirm with greater certainty the identity of the individual for whom they were

8   looking.  Under such circumstances, Nancy's statement was not testimonial and,

9   consequently, its admission into evidence did not violate petitioner's rights under the

10  Confrontation Clause.   It appears that an officer showed Jesus the gun several hours after

11  Nancy had been questioned (Ex. 1, Vol. 3 at 490-91), albeit at a time when a suspect had not

12  yet been apprehended.  Assuming, arguendo, such identification was testimonial, petitioner,

13  for all the reasons discussed above, fails to show its admission into evidence was prejudicial.

14          Accordingly, to the extent this claim is based on testimony concerning the children's

15  statements, petitioner has not shown the state court decision involved an unreasonable

16  application of law or was based on an unreasonable determination of the facts, and,

17  consequently, petitioner is not entitled to habeas relief.

18          6.      Juror with Language Difficulty

19          Petitioner contends that one of the jurors, juror Liang, was not proficient in English,

20  and thus that her presence on the jury violated his Sixth Amendment right to a jury trial.

21  (Pet. at 6c.)[15]  Both parties passed the juror for cause.  (Ex. 1, Vol. 9 at 96.)  Assuming,

22  arguendo, petitioner has not waived this claim by failing to challenge juror Liang, such

23  claim, as set forth below, nonetheless fails.

24          A criminal defendant has a Sixth Amendment right to be tried by "an impartial jury

25  . . . ."  U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961); Tinsley v. Borg,

26  895 F.2d 520, 523-34 (9th Cir. 1990) ("Even if only one juror is unduly biased or prejudiced,

27  _____

28          [15] Petitioner raised this claim in both of his state habeas petitions.  (Ex. 9 at 36-37; Ex. 11 at 39-40.)

1  the defendant is denied his constitutional right to an impartial jury.") (internal quotation and

2  citation omitted), cert. denied, 498 U.S. 1091 (1991).  The Sixth Amendment guarantee of a

3  trial by jury requires that the jury verdict be based on the evidence presented at trial.  Turner

4  v. Louisiana, 379 U.S. 466, 472-73 (1965); Jeffries v. Wood, 114 F.3d 1484, 1490 (9th

5  Cir.1997) (en banc).  It goes without saying that a juror who cannot understand the language

6  in which the trial is conducted cannot base his or her decision on the evidence presented.

7  See, e.g., United States v. Rouco, 765 F.2d 983, 988, 991 (11th Cir. 1985) (holding, on Sixth

8  Amendment claim, trial court had responsibility to remove juror with marginal command of

9  English and who was challenged for cause "if she could not impartially evaluate the evidence

10  and follow the court's instructions"); see also United States  v. Saadeh, 61 F.3d 510, 524-25

11  (7th Cir. 1995) (considering Sixth Amendment claim based on seating of juror with hearing

12  difficulties; requiring showing that loss of hearing was of such degree "as to indicate juror

13  may not have heard material testimony").

14         In this instance, the trial court, at the outset of the trial, addressed juror Liang

15  individually at some length, as did counsel for both the prosecution and the defense.  During

16  the course of that questioning, the juror stated she had completed the jury questionnaire by

17  herself, had been living in the United States for 13 years, attended high school in the United

18  States for one and half years, studied English as part of those studies, and passed a

19  citizenship test given in English.  (Ex. 1, Vol. 9 at 19-21, 54-55, 72-74.)  Further, in her

20  questionnaire, the juror said she had taken courses in child development at San Francisco

21  City College.  (Ex. 2 (Clerk's Transcript), Vol. 3 (Jury Questionnaires), Questionnaire of

22  Juror 3 at 5-7.)   Although the juror undoubtedly had some difficulty understanding

23  complicated legal concepts, and professed to understand little of the proceedings, her

24  education and various activities and accomplishments requiring an ability to communicate in

25  English, as well as her length of residency in the United States, reflected a level of

26  proficiency in the English language sufficient to allow her to base her vote on the evidence

27  presented.

28         As noted, both sides passed the juror for cause.  Moreover, this Court cannot say the

17

1   state court was unreasonable in determining her presence on the jury did not violate

2   petitioner's Sixth Amendment rights.  In that regard, this Court does not decide anew the

3   question of the juror's qualifications to serve.  As the Supreme Court recently emphasized:

> A state court's determination that a claim lacks merit precludes federal habeas
> relief so long as "fairminded jurists could disagree" on the correctness of the
> state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).
> And as [the Supreme] Court has explained, "[E]valuating whether a rule
> application was unreasonable requires considering the rule's specificity. The
> more general the rule, the more leeway courts have in reaching outcomes in
> case-by-case determinations."  Ibid.  "[I]t is not an unreasonable application of
> clearly established Federal law for a state court to decline to apply a specific
> legal rule that has not been squarely established by [the Supreme] Court."
> Knowles v. Mirzayance, 129 S.Ct. 1411, 1413-14 (2009) (internal quotation
> marks omitted).

10   Harrington v. Richter, 131 S.Ct. at 786-87 (noting "[s]ection 2254(d) reflects the view that

11   habeas corpus is a guard against extreme malfunctions in the state criminal justice systems,

12   not a substitute for ordinary error correction through appeal."  Here the rule is particularly

13   general in nature, a requirement that jurors be able to evaluate evidence given in English and

14   follow the trial court's instructions given in English.  The state court thus had considerable

15   "leeway," see id., in applying the rule.

16   Accordingly, petitioner is not entitled to habeas relief on this claim.

17   7.   Ineffective Assistance of Trial Counsel

18   Petitioner contends his trial counsel provided ineffective assistance, in that he: (1)

19   failed to move to suppress petitioner's confession as coerced and involuntary; (2) prevented

20   petitioner from testifying; (3) failed to object to the admission of Rosie's 1991 statement and

21   1999 declaration and to evidence concerning the children's statements given at the scene; (4)

22   failed to obtain telephone records that would have shown Rosie called him on December 17,

23   1999; and (5) failed to challenge juror Liang.

24   A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

25   Sixth Amendment's right to counsel, which guarantees not only assistance, but effective

26   assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to

27   prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner must

28   establish such counsel's performance was deficient, i.e., that it fell below an "objective

United States District Court
For the Northern District of California

standard of reasonableness" under prevailing professional norms. Id. at 687-88. Second, the petitioner must establish prejudice resulting from counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the Strickland test if the petitioner cannot establish incompetence under the first prong. Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, the court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. Strickland, 466 U.S. at 697.

A criminal defense lawyer need not file a motion that he knows to be meritless on the facts and the law; trial counsel cannot have been ineffective for failing to raise a meritless motion. Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005); see also Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999) (holding to show prejudice under Strickland based on failure to file a motion, petitioner must show that "(1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him)."

Here, the claimed ineffective assistance includes counsel's failure to raise issues this Court has discussed above and found unavailing. In particular, as noted, petitioner contends his counsel was ineffective in not filing a motion to suppress his confession as coerced and in violation of Miranda. As discussed above, however, petitioner failed to make an evidentiary record in state court to support such claim and cannot do so in the first instance here. See Cullen, 2011 Westlaw 1225705 at *8. Petitioner also asserts his counsel should have objected to the introduction of evidence of the out-of-court statements by Rosie and his children, and to any references to those statements. As discussed above, however, as to three of those statements, there was no error in the admission of such evidence and as to the fourth,

United States District Court
For the Northern District of California

1    as well as the other three, petitioner has failed to show prejudice.  Similarly, although

2    petitioner contends his counsel should have challenged juror Liang for cause, such claim

3    fares no better at this juncture.

4         Next, petitioner claims he told his counsel he wanted to testify, but his counsel rested

5    without calling him, thus preventing him from testifying about the coercion of his confession.

6    Once again, however, petitioner failed to make an evidentiary record in state court with

7    respect to such claim, and, as discussed above, petitioner has not established he is entitled to

8    an evidentiary hearing at this time.

9         Petitioner's final assertion in support of his claim of ineffective assistance by trial

10   counsel, specifically, that his counsel failed to introduce telephone records that petitioner

11   contends would have shown Rosie called him on the day of the murder, likewise fails for

12   lack of a factual basis, and, in any event, petitioner does not explain how such evidence

13   would have assisted him, let alone resulted in a different outcome.

14        Accordingly, petitioner has not shown the state court's decision as to this claim

15   involved an unreasonable application of Supreme Court law or an unreasonable

16   determination of the facts, and thus petitioner is not entitled to relief on this claim.

17        8.    Ineffective Assistance of Appellate Counsel

18        Petitioner contends his appellate counsel should have raised the issues discussed

19   above that were not presented on direct appeal, specifically, claims 1-4, 6 and 7.

20        The Due Process Clause of the Fourteenth Amendment guarantees a criminal

21   defendant the effective assistance of counsel on his first appeal.  Evitts v. Lucey, 469 U.S.

22   387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed

23   according to the standard set out in Strickland.  See Strickland, 466 U.S. at 668; Miller v.

24   Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  A petitioner therefore must show his counsel's

25   advice fell below an objective standard of reasonableness and that there is a reasonable

26   probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.

27   Miller, 882 F.2d at 1434 & n.9.

28        Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue

**United States District Court**
For the Northern District of California

1   requested by a criminal defendant. <u>Jones v. Barnes</u>, 463 U.S. 745, 751-54 (1983).  The

2   weeding out of weaker issues is widely recognized as one of the hallmarks of effective

3   appellate advocacy. <u>Id.</u> at 1434.  Consequently, appellate counsel frequently will remain

4   above an objective standard of competence and, for the same reason, will have caused his

5   client no prejudice, specifically, because he or she declined to raise a weak issue.  <u>Id.</u>

6        In the instant case, because none of the claims discussed herein are meritorious, any

7   failure on the part of counsel to raise them on appeal was neither deficient assistance nor

8   prejudicial to petitioner.

9        Accordingly, petitioner is not entitled to relief on this claim.

10       9.    <u>Peremptory Strike</u>

11       Petitioner contends the prosecutor struck prospective juror Kimberly B. because she

12   was African-American.

13            a.    <u>Background</u>

14       The Court of Appeal described the background for this claim as follows:

15   The voir dire of the prospective juror Kimberly B. began with the trial court
     questioning her about information she had included in her juror questionnaire.

16   Her cousin had been arrested when she "was little," but she had no indication
     her cousin was unfairly treated and the arrest did not affect her ability to be fair

17   and impartial. She had been the victim of juvenile vandalism of her car, but did
     not make a police report because the juveniles "were long gone" by the time

18   police arrived. Nothing about the vandalism affected her ability to be fair and
     impartial. The court asked her about her brother having been killed by his

19   girlfriend. Kimberly B. said that "was about 20 years" ago, and that too did not
     affect her fairness and impartiality as a juror.

20
     The court asked Kimberly B. about her general feelings about the criminal

21   justice system. She had stated in her questionnaire that the system had too
     many loopholes and was sometimes unfair. When asked to elaborate, she said:

22   "Certain crimes, like spousal abuse or rape or something, I just feel usually the
     perpetrator doesn't get what should be coming to them. Sometimes they just

23   seem to get off too easy or not serve all the time for certain crimes. Just in
     general. Not speaking of anything in particular." These views would not

24   influence her ability to sit in the case as a juror.

25   Finally, the court asked Kimberly B. about domestic violence. Her sister had
     been a victim of domestic violence, and her brother had been accused of

26   domestic violence, about 15 years previously. Kimberly B. had not witnessed
     any domestic violence and neither incident would affect her ability to be a fair

27   and impartial juror.

28   The prosecutor asked only a few questions of Kimberly B. He asked about the
     domestic violence incidents and confirmed that Kimberly B. felt there were too

many loopholes in the law. He asked if she could judge the case on the evidence, and convict if the People showed proof beyond a reasonable doubt-even if the only proof was testimony of a police officer. Kimberly B. said she could.

Likewise, the defense asked only a few questions. Kimberly B. told defense counsel she could be fair and impartial even though the case involved domestic violence allegations and Kimberly B. felt that "domestic violence perpetrators don't get what's coming to them." Counsel asked, "I think you noted the system is sometimes unfair, and I'm wondering to whom you think it's unfair?" Kimberly B. responded, "I guess victims."

After the prosecutor exercised a peremptory challenge against Kimberly B., defendant made a <u>Wheeler</u> motion. Defendant argued that the prosecutor had improperly used his peremptory challenge to exclude Kimberly B. on the basis of race.  In response to the motion, the prosecutor stated for the record that "there is an African American woman currently in the jury box . . . [and] [t]here are several African American jurors out in the panel." The prosecutor also stated, "The Court itself read the questionnaires. . . ."

The trial court found that defendant had established a prima facie case, although the court characterized the showing as "very marginal." Thus, the burden passed to the prosecutor to explain the reasons for the challenge.

The prosecutor gave these reasons for the peremptory challenge: "One of the things that initially concerned me when reading the questionnaire regarding [Kimberly B.] was her interest in psychology. That was a note that I had written down already. She had cousins who had been arrested before, and she had a brother accused of domestic violence before. [¶] "She had a brother killed by a girlfriend, <u>and when I was asking her about that and when the Court was asking [her] about that, I didn't think she showed a whole lot of concern or interest in that with me.</u> Also I have notes written down that when she answered the question about what her problems were with the criminal justice system, she said 'I guess victims,' <u>which made me think she was coming up with an answer rather than something that was directly there out in front of her.</u> [¶] "She was also, I also noticed her shaking her head in an affirmative fashion when [defense counsel] was talking about reasonable doubt to another juror, <u>which that sort of outward manifestation of thoughts and feelings regarding that issue concerned me.</u> She also took, I believe in my notes I have [that] she took a criminal law course; that concerned me as well. [¶] "That is a thumbnail sketch of my concerns with [Kimberly B.], all of which are obviously race neutral." (Italics added.)

Defense counsel did not respond to this argument. Indeed, he made no further substantive argument on the motion. He did not challenge the sincerity of the prosecutor's reasons. He did not dispute the prosecutor's observation that Kimberly B. nodded her head when defense counsel spoke about reasonable doubt. He did not dispute the prosecutor's characterization that "I guess victims" was "coming up with an answer." He did not challenge the accuracy of any factual information the prosecutor took from the juror questionnaire.

The court found that "the explanation that [the prosecutor]  provided the Court was sincere and genuine . . . I think the reasons given by [the prosecutor] that [Kimberly B.] had an interest in psychology, that her cousin was arrested, her brother was arrested for domestic violence, that the answer that she gave about the criminal justice system did seem to be a little strange. And also, I didn't

United States District Court
For the Northern District of California

1  notice her shaking her head about readable [ sic ] doubt, but I don't have any
2  reason to think she wasn't sincere. Also her brother was killed by a girlfriend."
   The court denied the Wheeler motion.

3  (Ex. 6 at 5-8 (alterations and emphases in original) (footnote omitted); see Ex. 1, Vol. 10 at

4  50-54, 86-87.)[16]

5      The Court of Appeal concluded: "[W]e cannot say that the trial court's findings are

6  suspect, or that the court erred by denying defendant's Wheeler motion." (Id. at 10.)[17]

7                  b.    Merits of Petitioner's Batson Claim

8                        (1)    Standard

9      The Equal Protection Clause "forbids the prosecutor to peremptorily challenge

10  potential jurors solely on account of their race." Batson v. Kentucky, 476 U.S. 79, 89 (1986).

11  A defendant may raise an equal protection claim based on the exclusion of a juror because of

12  the juror's race, regardless of whether the defendant and the excluded juror share the same

13  race. Powers v. Ohio, 499 U.S. 400, 406 (1991).

14      Under Batson, a violation of equal protection is established in the trial court by a

15  three-step procedure. Batson, 476 U.S. at 96-98. First, the defendant must make a prima

16  facie showing that the totality of the relevant facts gives rise to an inference of discriminatory

17  purpose." Id. at 93-94. Second, if the defendant makes such a prima facie showing, the

18  burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror in

19  question. Id. at 94. Finally, if the prosecutor offers a race-neutral explanation for the

20

21 _____

22      [16]  The record before this court as to jury selection is confusing. In most instances the
   jurors' names have been redacted and what apparently is a seat number has been substituted.
23  The jurors names have been redacted from their questionnaires and some form of juror
   number substituted. There is a summary of the various problems, as well as a chart that
   correlates to some juror seat numbers, juror numbers, and redacted names, in petitioner's
24  opening brief on appeal. (Ex. 4 at 18-20.)

25      [17] Under California law, Wheeler motions are made in response to an alleged pattern
   of discriminatory peremptory challenges used to strike potential jurors on the basis of race.
26  See People v. Wheeler, 22 Cal. 3d 258, 276-77 (1978). Batson, the federal counterpart of
   Wheeler, provides similar protections against group bias in the exercise of peremptory
27  challenges. Batson v. Kentucky, 476 U.S. 79, 85-86 (1986). Earlier in its opinion, the Court
   of Appeal, citing Batson, noted that subsequent to Wheeler, "the United States Supreme
28  Court ruled that such use of peremptory challenges violated the federal Constitution." (Ex. 6
   at 4 n.2.)

**United States District Court**
For the Northern District of California

1 challenge, the trial court must determine whether, despite the prosecutor's proffered

2 explanation, the defendant has carried the burden of proving purposeful discrimination.  Id. at

3 97-98.  In resolving the question, the trial court evaluates the totality of the relevant facts.

4 Ali v. Hickman, 571 F.3d 902, 908 (9th Cir. 2009).

5          (2)   Analysis

6         In the instant case, the trial court's finding on the question of discriminatory purpose

7 was made at the third step of the above-described Batson analytical model.  The findings of

8 the trial court on such issue are findings of fact entitled to a presumption of correctness on

9 federal habeas review.  See Purkett v. Elem, 514 U.S. 765, 769 (1995).  The factual findings

10 of the state appellate court on such issue likewise are entitled to a presumption of correctness.

11 See Mitleider v. Hall, 391 F.3d 1039, 1050 (9th Cir. 2004); Williams v. Rhoades, 354 F.3d

12 1101, 1108 (9th Cir. 2004).  Petitioner thus must show the state court's conclusion to be "an

13 unreasonable determination of the facts in light of the evidence presented in the state court

14 proceeding."  See id.  Consequently, this Court can grant habeas relief only "if it was

15 unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge."

16 Rice v. Collins, 546 U.S. 333, 338 (2006).

17         The reasons the prosecutor gave for his decision to exercise a peremptory challenge as

18 to Kimberly B. were (1) her interest in psychology; (2) her family background, which

19 included cousins who had been arrested and a brother who had been accused of domestic

20 abuse; (3) her apparent lack of concern about her brother's having been killed by a girlfriend;

21 (4) her opinion that there are problems with the criminal justice system, and somewhat

22 ambiguous elaboration: "I guess victims;" (5) her apparent empathy with the defense,

23 nodding her head when defense counsel explained the concept of reasonable doubt; and (6)

24 her completion of a course in criminal law.  (Ex. 1, Vol. 1 at  at 48-49.)

25         The inquiry at this third step is "whether the prosecutor was 'motivated in substantial

26 part by discriminatory intent.'"  Cook v. Lamarque, 593 F.3d 810, 814-15 (9th Cir. 2010)

27 (quoting Snyder v. Louisiana, 552 U.S. 472, 485 (2008)).  Proof of such discriminatory intent

28

United States District Court
For the Northern District of California

or purpose is required to show a violation of the Equal Protection Clause, see Hernandez v. New York, 500 U.S. 352, 355-62 (1991), and a judge ruling on an objection to a peremptory challenge is required to consider such circumstantial and direct evidence of intent as may be available, see Batson, 476 U.S. at 93. In that regard, the judge must "tak[e] into account all possible explanatory factors in the particular case." Id. at 95 (internal quotation and citation omitted).

Here, the reasons given by the prosecutor were facially neutral and reasonably related to meaningful, non-discriminatory jury selection. A prosecutor might well prefer not to have someone on the jury who was interested in psychology, for fear such interest might lead to leniency in determining a defendant's mental state with respect to the degree of the crime charged. Additionally, a prosecutor might wish to excuse a juror who has studied criminal law, for fear such potentially imperfect knowledge might be given too much weight either by the juror or by the other jurors. He also might prefer not to have a juror whose family members had been arrested or accused of domestic abuse, as such a juror might sympathize with a defendant who, like petitioner, is accused of domestic violence and past abuse. Although Kimberly B.'s reaction to her brother's killing, her somewhat disengaged explanation of her concerns regarding the criminal justice system, and visible agreement during voir dire by the defense are subject to various interpretations, they cannot be fully evaluated on a paper record, and, at a minimum, a litigator looking for predictability might well be wary of accepting a juror with that constellation of ambiguities coupled with his other concerns.

Further, in this instance, a comparative juror analysis, i.e., a comparison of the characteristics possessed by non-challenged jurors with those of jurors challenged by the prosecution, weighs against a finding of discriminatory intent. See Miller-El v. Dretke, 545 U.S. 231, 242-43; 244-55) (2005) ("Miller-El II") (setting forth various factors relevant to determination, including whether comparative juror analysis, percentage of African-Americans stricken, use of "shuffling," disparate questioning on voir dire, and prosecutor's

25

United States District Court
For the Northern District of California

1    offices's use of racist training manual).[18]

2        In particular, as respondent notes, a number of jurors whom the prosecutor struck

3    shared characteristics with Kimberly B. (Resp't Supp. Br. at 8-9), and petitioner points to no

4    seated jurors who shared any of the characteristics on which the prosecutor challenged

5    Kimberly B.[19]

6        Although Juror 17 had a cousin who had been arrested in Oklahoma on drug charges,

7    she stated that she did not know the cousin, and unlike Kimberly B., she did not have a

8    brother who had been accused of domestic abuse.  (Ex. 2, Vol. 3 (Jury Questionnaires),

9    Questionnaire of Juror 17 at 10.)  Although Juror 81 was critical of the justice system, the

10   prosecutor's objection to Kimberly B. was not her belief that there are problems with the

11   system, but rather the ambiguity in her answer when asked to explain. (Id., Questionnaire of

12   Juror 81 at 13.)  Further, although some of Kimberly B.'s experiences, e.g., the vandalism of

13   her car, and concern that some criminal defendants receive lenient sentences, might suggest

14   an attitude not adverse to the prosecution, such responses may well have been outweighed by

15   the juror's less favorable responses, on which the prosecutor based his challenge.

16       In sum, "the most significant justifications . . . were entirely sound," see Cook, 593

17   F.3d at 826, and, consequently, the Court of Appeal was not unreasonable in finding

18   petitioner's constitutional rights as set forth in Batson were not violated.

19       Accordingly, petitioner is not entitled to habeas relief on this claim.

20       10.    Adequacy of Trial Court's Consideration of Wheeler/Batson Motion

21       Petitioner contends the trial court failed to conduct an adequate evaluation of the

22

23       [18]  In the instant case although neither the trial nor appellate court conducted a
24   comparative juror analysis, this Court has received the parties' respective supplemental
     briefing on comparative juror analysis, see Green, 542 F.3d at 1030, and in connection
25   therewith respondent has submitted an additional exhibit (see Resp't Ex. 13), which contains
     the portions of voir dire not previously submitted.  (See Ex. 1, Vol. 1 at 44-51; Ex. 1, Vol.
26   10; Ex. 2, Vol. 3).

27       [19]  The only indication in the record as to the race of the jurors who ultimately were
     seated is the prosecutor's response to petitioner's Wheeler/Batson motion.  (See Ex. 1, Vol. 1
28   at 4b) ("[J]uror number one is an Asian woman.  Juror number two is [a] Filipino woman.
     Juror number three is an African American woman.  Juror number five is a Filipino woman,"
     and "there is an African American woman currently in the jury box . . . .").)

1    prosecutor's reasons for exercising a strike.  (Pet. at 7-8.)  After hearing the prosecutor's

2    reasons, the trial court ruled as follows.

> Okay.  I feel that the explanation that Mr. Burke provided the Court was
> sincere and genuine, and I'm going to deny the motion as to Ms. [B].  I think
> the reasons given by Mr. Burke that she had an interest in psychology, that her
> cousin was arrested, her brother was arrested for domestic violence, that the
> answer that she gave about the criminal justice system did seem to be a little
> strange.  And also, I didn't notice her shaking her head about readable [sic]
> doubt, but I don't have any reason to think she wasn't sincere.  Also her brother
> was killed by a girlfriend.  So if I haven't said so, I'm going to say so.  The
> motion is denied, and I'm giving you my reasons.

8    (Ex. 1, Vol. 1 at 50.)

9        A trial court is obligated "to undertake a sensitive inquiry into such circumstantial and

10   direct evidence of intent as may be available."  Batson, 476 U.S. at 93.  In the instant case,

11   the trial court made such a determination and, in accepting the sincerity of the prosecutor's

12   stated reasons, made note of the fact that the juror had family members who had faced

13   charges of a similar nature, albeit of considerably lesser severity than the crimes charged

14   against petitioner, as well as the manner and reasonableness of certain of her other responses.

15   Such considerations and determination thereafter suffice to establish that the trial court did in

16   fact "undertake" the necessary inquiry.  See Williams v. Rhoades, 354 F.3d 1101, 1106-08

17   (9th Cir. 2004) (holding even where trial court made no explicit findings as to credibility,

18   state appellate court could reasonably conclude trial court made sincere and reasoned attempt

19   to evaluate prosecutor's intent).

20       Accordingly, petitioner is not entitled to habeas relief on this claim.

21       11.    Failure to Preserve Questionnaires

22       Petitioner contends "the judgment should be reversed" because the clerk of court

23   failed to preserve the questionnaires of the jurors who were not selected to serve, including

24   Kimberly B.  (Pet. at 6i.)  The Court of Appeal rejected this claim on direct appeal,

25   explaining:

> The Alameda County Clerk retained only the juror questionnaires of the 12 trial
> jurors and the 3 alternates. This fact came to light after we granted defendant's
> motion to augment the record with the questionnaires of all prospective jurors
> who had not been excused for hardship or cause. Defendant now claims the

United States District Court
For the Northern District of California

clerk's failure to retain Kimberly B.'s questionnaire, as well as the questionnaires of the prospective jurors in the jury box at the time she was challenged, has denied him his due process right to an adequate appellate record and thus prevents effective review of his <u>Wheeler</u> issue. (<u>See</u> <u>Howard</u>, <u>supra</u>, 1 Cal. 4th at ¶. 1164-1166; <u>see also</u> <u>People v. Chessman</u> (1950) 35 Cal. 2d 455, 460-463 (<u>Chessman</u>).) We disagree.

We need not discuss in detail the analytical approach of <u>Howard</u> and <u>Chessman</u>. Defendant concedes that he can only prevail on this issue if he shows the missing questionnaires prevent "adequate and effective appellate review" of his <u>Wheeler</u> issue. (<u>Howard</u>, <u>supra</u>, 1 Cal.4th at p. 1166.) The absence of the questionnaires does not deprive defendant of such review.

*Kimberly B.'s Questionnaire*

We have already concluded there was no <u>Wheeler</u> error. The absence of Kimberly B.'s questionnaire does not affect or alter that conclusion. The trial court read her questionnaire. There was no dispute below as to its contents. The text of the questionnaire is not necessary to permit us to provide adequate and effective review of defendant's <u>Wheeler</u> claim. The existing record is sufficient to permit such review, and defendant is not prejudiced by the absence of the juror's questionnaire. (<u>See</u> <u>People v. Ayala</u> (2000) 24 Cal.4th 243, 269-270 (<u>Ayala</u>).)

*The Other Prospective Jurors' Questionnaires*

Defendant argues the absence of these questionnaires makes it impossible for him to perform an analysis based on interjuror comparison. But defense counsel did not make an interjuror comparison below, and interjuror comparison may not be done on appeal. (<u>Ayala</u>, <u>supra</u>, 24 Cal.4th at pp. 269-270.)

(Ex. 6 at 10-11) (footnotes omitted).)

"[T]he Constitution does not require states to grant appeals as of right to criminal defendants seeking to review alleged trial court errors." <u>Evitts v. Lucey</u>, 469 U.S. 387, 393 (1985). If, however, a state creates a system for appellate review, the procedures must comport with due process. <u>Id.</u>

In that regard, the instant claim is analogous to claims alleging a due process violation where the state has failed to provide a criminal defendant with a transcript of the trial court proceedings for use on appeal. Such a violation is shown where state law provides for an appeal and the absence of a transcript effectively precludes one. <u>Madera v. Risley</u>, 885 F.2d 646, 648 (9th Cir. 1989) (holding state's failure to provide full record of criminal trial may violate due process and form basis for federal habeas relief). Two criteria are relevant to a determination of the issue: (1) the value of the transcript to the defendant in connection with

**United States District Court**
For the Northern District of California

1  the appeal for which it is sought; and (2) the availability of alternative devices that would

2  fulfill the same functions as a transcript. <u>Britt v. North Carolina</u>, 404 U.S. 226, 227 & n.2

3  (1971); <u>Madera</u>, 885 F.2d at 648.

4        Here, the questionnaires of the other non-selected jurors would have had no value to

5  petitioner, as comparative juror analysis calls for a comparison of the stricken juror to those

6  jurors who were seated, not those who did not serve. <u>See</u> <u>Miller-El v. Dretke</u>, 545 U.S. 231,

7  241 (2005) ("<u>Miller-El II</u>") (comparing stricken, African-American juror, with "otherwise-

8  similar nonblack" jurors who were "permitted to serve"). Further, the prosecutor, in the

9  course of his questioning, relied on several of Kimberly B.'s questionnaire answers, at least

10  two of which provided reasons for his strike, and neither the trial court nor defense counsel

11  disputed the prosecutor's characterization of those responses. Under the circumstances, the

12  Court of Appeal was not unreasonable in determining the existing record was adequate to

13  permit appellate review, nor was its decision contrary to or an unreasonable application of,

14  clearly established Supreme Court authority or based on an unreasonable determination of

15  the facts.

16        Accordingly, petitioner is not entitled to habeas relief on this claim.

17  C.    <u>Appealability</u>

18        The federal rules governing habeas cases brought by state prisoners require a district

19  court that issues an order denying a habeas petition to either grant or deny therein a

20  certificate of appealability. <u>See </u>Rules Governing § 2254 Cases, Rule 11(a).

21        A petitioner may not appeal a final order in a federal habeas corpus proceeding

22  without first obtaining a certificate of appealability (formerly known as a certificate of

23  probable cause to appeal). <u>See</u> 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall

24  grant a certificate of appealability "only if the applicant has made a substantial showing of

25  the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate

26  which issues satisfy this standard. <u>Id.</u> § 2253(c)(3). "Where a district court has rejected the

27  constitutional claims on the merits, the showing required to satisfy § 2253(c) is

28  straightforward: the petitioner must demonstrate that reasonable jurists would find the district

1  court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529

2  U.S. 473, 484 (2000).

3        Here, petitioner has not made such a showing and, accordingly, a certificate of

4  appealability will be denied.

5                          **CONCLUSION**

6        For the reasons stated above, the Court orders as follows:

7        1.  Petitioner's request for an evidentiary hearing (Doc. No. 23) is hereby DENIED.

8        2.  The petition for a writ of habeas corpus is hereby DENIED.

9        The Clerk shall enter judgment in favor of respondent and close the file.

10       IT IS SO ORDERED.

11  DATED:  April 20, 2011

12                                          MAXINE M. CHESNEY
                                            United States District Judge

**United States District Court**
For the Northern District of California